# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| STACEY MOONEY, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| ILLINOIS EDUCATION ASSOCIATION; CONGERVILLE-EUREKA-GOODFIELD EDUCATION ASSOCIATION, as representative of the class of all chapters and affiliates of the Illinois Education Association; and NATIONAL EDUCATION ASSOCIATION. | ) ) ) ) ) ) ) ) | Case No.  1:18-cv-1439 |
| Defendants. | ) ) | |

## ORDER & OPINION

This matter is before the Court on Defendants' Motion to Dismiss (Doc. 11). Plaintiff has filed a response (Doc. 14) and Defendants have filed a reply with the Court's leave (Doc. 18). Although Defendants requested oral argument (Doc. 11 at 2), the Court denies the request because this matter can be decided on the papers. The matter is therefore ripe for review.

### BACKGROUND

Plaintiff Stacey Mooney is a public school teacher in the Eureka Community School District # 140 and resides in Tazewell County, Illinois. (Doc. 1 at 2). Over the course of her nearly three decades of teaching, she has declined to join Defendant Illinois Education Association or its affiliates, Defendant Congerville-Eureka-Goodfield Education Association and Defendant National Education Association,

because she "disapproves of their political advocacy and collective bargaining activities" and "the excessive salaries" paid to high-ranking union officials. (Doc. 1 at 2).

Though not a member of any union, Plaintiff was nevertheless required by law to pay "fair-share" fees to Defendants. (Doc. 1 at 2). Relying on the Supreme Court's recent ruling in *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018),[1] Plaintiff now seeks reimbursement of the fair-share fees she and the putative class members paid to Defendants.

## DISCUSSION

The discussion of this case must begin with the Supreme Court's decision in *Janus*, which held the Illinois law requiring certain employees pay fair-share fees violated the First Amendment. Prior to *Janus*, Illinois law was as follows:

> Under the Illinois Public Labor Relations Act (IPLRA), employees of the State and its political subdivisions are permitted to unionize. See Ill. Comp. Stat., ch. 5, § 315/6(a) (West 2016). If a majority of the employees in a bargaining unit vote to be represented by a union, that union is designated as the exclusive representative of all the employees. §§ 315/3(s)(1), 315/6(c), 315/9. Employees in the unit are not obligated to join the union selected by their co-workers, but whether they join or not, that union is deemed to be their sole permitted representative. *See* §§ 315/6(a), (c).

*Janus*, 138 S. Ct. at 2460. Because "the union is required by law to provide fair representation for all employees in the unit, members and nonmembers alike," and "[e]mployees who decline to join the union are not assessed full union dues," the law

---

[1] The American Federation of State, County, and Municipal Employees is hereinafter referred to as "AFSCME".

2

required non-union employees to pay fair-share fees, "a percentage" of the full union fee. *Id.* These fees could not be used for political expenditures. *Id.* at 2460–61.

A similar scheme was held constitutional in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). *Id.* at 2460. Prior to *Janus*, the Supreme Court "cited *Abood* favorably many times, and ha[d] affirmed and applied its central distinction between the costs of collective bargaining (which the government can charge to all employees) and those of political activities (which it cannot)." *Id.* at 2497 (Kagan, J., dissenting). Nevertheless, in recent years the Supreme Court twice cast doubt on *Abood*'s continuing validity. *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 311 (2012) ("Acceptance of the free-rider argument as a justification for compelling nonmembers to pay a portion of union dues represents something of an anomaly . . . ."); *Harris v. Quinn*, 573 U.S. 616, 635, 645–46, 635 (2014) (stating "[t]he *Abood* Court's analysis is questionable on several grounds" and declining to extend *Abood* because of its "questionable foundations.").

In *Janus*, the Supreme Court overruled *Abood*, holding state laws compelling public employees who are not union members to pay fair-share fees to a union violate the free-speech rights of those non-union employees. 138 S. Ct. at 2460. The Supreme Court concluded "*Abood* was wrongly decided" and refused to allow "unconstitutional exactions"—mandatory fair-share fees—"to continue indefinitely." *Id.* at 2486.

Plaintiff is not the first to offer an argument based on *Janus* seeking recovery of fair-share fees paid prior to its pronouncement. Among this Court's colleagues to have considered these suits, there is a consensus concluding fair-share fees collected

prior to *Janus* may not be recovered. *Danielson v. AFSCME, Council 28, AFL-CIO*, 340 F. Supp. 3d 1083, 1087 (W.D. Wash. 2018); *Cook v. Brown*, ___ F. Supp. 3d ___, No. 18-cv-1085, 2019 WL 982384, at *8 (D. Or. Feb. 28, 2019); *Carey v. Inslee*, ___ F. Supp. 3d ___, No. 18-cv-5208, 2019 WL 1115259, at *8–10 (W.D. Wash. Mar. 11, 2019); *Crockett v. NEA-Alaska*, ___ F. Supp. 3d ___, No. 18-cv-0179, 2019 WL 1212082, at *6 (D. Alaska Mar. 14, 2019); *Janus v. AFSCME, Council 31*, No. 15-cv-1235, 2019 WL 1239780, at *3 (N.D. Ill. Mar. 18, 2019); *Hough v. SEIU Local 521*, No. 18-cv-4902, 2019 WL 1274528, at *1 (N.D. Cal. Mar. 20, 2019); *Lee v. Ohio Educ. Ass'n*, ___ F. Supp. 3d ___, No. 18-cv-1420, 2019 WL 1323622, at *2 (N.D. Ohio Mar. 25, 2019). For following reasons, the Court joins this growing consensus.

## I. Good-Faith Defense

Defendants argue Plaintiff's primary claim—that under *Janus* she and the putative class members are entitled to a refund of all the fair-share fees they paid prior to *Janus*—is barred by a good-faith defense available to private parties sued under 42 U.S.C. § 1983. (Doc. 11 at 1). They assert this defense is particularly warranted here because the conduct was authorized by state statutes, which were not only presumptively valid, but valid under the Supreme Court's holding in *Abood*. The existence and contours of this good-faith defense are a matter of first impression in this District. On review, the Court concludes private parties facing a § 1983 lawsuit may advance a good-faith affirmative defense and Defendants have successfully done so in this case.

*Type of Motion & Legal Standard*

As an initial matter, Defendants have erred by making this argument under Federal Rule of Civil Procedure 12(b)(6) rather than Rule 12(c) or Rule 56. The good-faith defense is an affirmative defense. *See Wyatt v.* Cole, 504 U.S. 158, 169 (1992) ("[W]e do not foreclose the possibility that private defendants faced with § 1983 liability . . . could be entitled to an affirmative defense based on good faith . . . ."); *Cook*, 2019 WL 982384, at *6.[2] "[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). Whether to dismiss a case due to an affirmative defense is a question properly resolved under Rule 12(c). *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 975 (7th Cir. 2013). Though Plaintiff does not object to the improper usage of Rule 12(b)(6), the Court declines to consider this portion of Defendants' motion under that Rule.

Nevertheless, the Seventh Circuit has "found such procedural missteps [are] harmless when all the facts necessary to rule on the affirmative defense are properly before the court on the motion to dismiss." *United States v. Rogers Cartage Co.*, 794

---

[2] Although the Court is persuaded by the above-cited authority concluding the good-faith defense is an affirmative defense, the Court recognizes some authority suggests the good-faith defense is a standard, rather than affirmative, defense. *See Wyatt*, 504 U.S. at 172 (Kennedy, J., concurring) ("[I]t is something of a misnomer to describe the common law as creating a good-faith *defense*; we are in fact concerned with . . . the essential elements of the tort." (emphasis in original)); *Pinsky v. Duncan*, 79 F.3d 306, 312 (2d Cir. 1996). However, the Court's ultimate decision would be unaffected if it is a standard defense. If it were, the Court would not construe Defendants' motion under Rule 12(c) but rather would decide it under Rule 12(b)(6) and would find that the inquiry requires looking to the most analogous common law tort, contrary to the holding *infra* in Section I(C)(2). For the reasons stated in footnote five, *infra*, this inquiry would not alter the outcome in this case.

F.3d 854, 861 (7th Cir. 2015); *see also Brownmark*, 682 F.3d at 692 ("The district court could properly consider an affirmative defense in the context of a motion for summary judgment, which it did here, regardless of the caption [the defendant] used."). Indeed, this particular procedural misstep "is of no consequence because [the] standard of review is the same." *Veit v. Frater*, 715 F. App'x 524, 526–27 (7th Cir. 2017). "To survive a motion for judgment on the pleadings, a complaint must 'state a claim to relief that is plausible on its face.' " *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 357–58 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007)). "A claim has 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* at 358 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And "[i]n assessing a motion for judgment on the pleadings," the Court draws "all reasonable inferences and facts in favor of the nonmovant, but need not accept as true any legal assertions." *Id.*

### B. There is a Good-Faith Defense for Private Parties Sued Under § 1983

Plaintiff never quite argues the good-faith defense does not exist. (*See* Doc. 14 at 23 ("There is much to be said in support of a 'good faith' defense that shields private defendants from liability for *damages* that result from an innocent but unconstitutional seizure of property.") (emphasis in original)). However, she repeatedly indicates in that direction (*e.g.* Doc. 14 at 16 ("There is obviously no 'good faith' defense in the text of section 1983")), uses quotation marks to offset the words "good faith," and spends over a page arguing Defendants overstated the support in the judiciary for the defense (Doc. 14 at 21-23). The Court therefore infers she is not

conceding the existence of such a defense. Accordingly, the threshold consideration is whether a good-faith defense exists for private parties sued under § 1983. *See Cook*, 2019 WL 982384, at *5.

The Seventh Circuit has yet to issue a decision on the good-faith defense in this context. *Janus*, 2019 WL 1239780, at *2; *Winner v. Rauner*, No. 15-cv-7213, 2016 WL 7374258, at *5 (N.D. Ill. Dec. 20, 2016). The Supreme Court has also explicitly left this question open. *Wyatt*, 504 U.S. at 169; *Richardson v. McKnight*, 521 U.S. 399, 414 (1997). Therefore, no binding precedent dictates this Court's determination.

Lack of binding precedent, however, does not mean this Court is left adrift. State entities, state employees, and municipal entities enjoy labyrinthine fortresses of immunities and protections against liability under § 1983.[3] Following the Supreme Court's holding that private parties may be liable under § 1983 in situations where they act according to a state-created system, *Lugar v. Edmondson Oil Co., Inc.*, 457

---

[3] *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 65–66 (1989) ("[A] State is not a 'person' within the meaning of § 1983 . . . ."); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (noting sovereign immunity extends to cases where a State is the party in interest, although an individual is named in the caption, because the action in essence seeks recovery from the State); *Nixon v. Fitzgerald*, 457 U.S. 731, 749–52 (1982) (noting presidents, prosecutors, and judges enjoy absolute immunity from damages and liability for actions taken in their respective presidential, prosecutorial, and judicial functions); *Harlow v. Fitzgerald*, 457 U.S. 800, 815–19 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" but only "when execution of a government's policy or custom" made by an official policymaker "inflicts the injury [may] the government as an entity [be held] responsible under § 1983.").

U.S. 922, 942 (1982), private parties newly exposed to § 1983 liability sought to gain access to similar forms of immunity. The Supreme Court first considered this question in *Wyatt*, where it held "qualified immunity, as enunciated in *Harlow*" was not "available for private defendants faced with § 1983 liability" under *Lugar*. 504 U.S. at 168–69.

However, as noted above, the Supreme Court did not "foreclose the possibility that private defendants faced with § 1983 liability under *Lugar* . . . could be entitled to an affirmative defense based on good faith . . . or that § 1983 suits against private, rather than governmental, parties could require plaintiffs to carry additional burdens." *Id.* at 169. The Supreme Court was particularly concerned that "principles of equality and fairness may suggest . . . that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts." *Id.* at 168. Chief Justice Rehnquist and Justice Kennedy, writing in dissent and concurrence, respectively, believed a good-faith defense did exist but differed on its application. *Id.* at 169–70 (Kennedy, J., concurring), 175–77 (Rehnquist, C.J., dissenting).

Since *Wyatt*, every federal appellate court to have decided the question has held a good-faith defense exists for private parties sued under § 1983. *Winner*, 2016 WL 7374258, at *5 (citing *Pinsky*, 79 F.3d at 311–12; *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1275–78 (3d Cir. 1994); *Wyatt v. Cole*, 994 F.2d 1113, 1118–21 (5th Cir. 1993); *Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692, 698–99 (6th Cir. 1996); *and Clement v. City of Glendale*, 518 F.3d

1090, 1096–97 (9th Cir. 2008)).[4] This Court finds the consensus of post-*Wyatt* circuit decisions and the reasoning contained therein persuasive. Also persuasive are opinions from other district courts in this circuit: *Winner*, 2016 WL 7374258, and *Janus*, 2019 WL 1239780, in which the Northern District of Illinois concluded a good-faith defense existed, and *Lewis v. McCracken*, 782 F. Supp. 2d 702, 715 (S.D. Ind. 2011), in which the Southern District of Indiana concluded the same. But most persuasive is *Wyatt* itself. Although the statement regarding the good-faith defense in the Supreme Court's opinion was dicta, the reasoning—that it would be anomalous to grant broad immunities or protections to all state actors while simultaneously denying private actors a longstanding common law defense—is convincing. This Court therefore holds at least some private actors sued under § 1983 may invoke an affirmative defense of good-faith.

### C.    The Good-Faith Defense is Available in this Case

Plaintiff argues that if a good-faith defense is available, it is not available here for several reasons. Those proffered reasons are: (1) the good-faith defense shields a defendant solely from damages, not from return of unlawfully taken property; (2) the good-faith defense can only exist where the most analogous tort at common law required scienter; (3) Seventh Circuit precedent requires this Court to hold non-

---

[4] Plaintiff suggests the First Circuit in *Downs v. Sawtelle*, 574 F.2d 1, 15–16 (1st Cir. 1978) and the Ninth Circuit in *Howerton v. Gabica*, 708 F.2d 380, 385 n.10 (9th Cir. 1983) rejected the good-faith defense. These cases, however, were decided prior to *Wyatt*. To the extent these cases stand for the proposition Plaintiff suggests, the Court therefore would find them an unpersuasive counterweight to later decisions—including the Ninth Circuit's later holding—by courts of appeals considering this question.

members who paid fair-share fees are entitled to a refund; and (4) the good-faith defense ought not apply to private institutional defendants, just as qualified immunity does not apply to public institutional defendants.

1. **The Good-Faith Defense is Available in Restitution Cases, at Least Where the Relief Sought is Legal Rather Than Equitable**

The Western District of Washington ably explained why merely casting a remedy as equitable relief does not defeat the good-faith defense, even assuming the good-faith defense cannot apply to equitable relief:

> A plaintiff may not circumvent qualified immunity or the good faith defense simply by labeling a claim for legal damages as one for equitable restitution. *See Lenea v. Lane*, 882 F.2d 1171, 1178–79 (7th Cir. 1989) ("Regardless of what label is placed on the monetary relief which Lenea wants, 'equitable' or 'legal damages,' it remains a personal monetary award out of the official's own pocket."); *see also Clanton v. Orleans Par. Sch. Bd.*, 649 F.2d 1084, 1101 (5th Cir. 1981) (rejecting the "distinction between equitable and legal relief for purposes of the qualified immunity defense"). In other words, Plaintiffs cannot save their claim through a mere "semantic exercise" if equitable relief is not actually available. *Lenea*, 882 F.2d at 1179.

*Carey*, 2019 WL 1115259, at *9.

"[N]ot all relief falling under the rubric of restitution is available in equity." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). An equitable remedy typically seeks return of a specific object as opposed to the monetary value of that object. *Montanile v. Bd. of Trs. of Nat'l. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 658–59 (2016). As the *Carey* court noted, the presupposition in cases like the one at hand is that all identifiable money was used to fund union activities and, consequently, has already been dissipated; Plaintiff could receive the value of her fair-share fees but not the specific money she paid. *Carey*, 2019 WL 1115259, at *9.

Plaintiff's citations to cases concerning cows and cars, undissipated specific objects, seized in good faith but unconstitutionally (Doc. 14 at 23) are thus inapposite.

If all identifiable monies sought by a plaintiff have been expended, the "plaintiff then may have a personal claim against the defendant's general assets— but recovering out of those assets is a *legal* remedy, not an equitable one." *Montanile*, 136 S. Ct. at 658 (emphasis in original). Plaintiff's claim lies in law rather than equity, and there is consequently no reason to consider whether the good-faith defense applies where the claim is for equitable restitution. *See Crockett*, 2019 WL 1212082, at *5 ("Plaintiffs' argument is also flawed in that the relief they seek does in fact sound in law. Their fair-share fees paid for ongoing costs of representation the Union Defendants provided on their behalf.").

Plaintiff argues that *Carey* and other cases rejecting claims essentially identical to hers fail to sufficiently explain why the good-faith defense can apply against a claim for restitution and suggests the defendants in those cases received a windfall. (Doc. 14 at 23-24). The Court disagrees with Plaintiff's suggestion that the Court's counterparts have failed to provide thorough explanations, but will try its hand at one nonetheless.

The gravamen of Plaintiff's objection is that "the union was unjustly enriched by the unconstitutional agency-shop arrangements that it enforced." (Doc. 14 at 17). She further suggests the *Janus* Court disavowed or abrogated the view that fair-share fees were justly paid for services rendered. (Doc. 14 at 17 n.6 ("Petitioner . . . argues that he is not a free rider on a bus headed for a destination that he wishes to

reach but is more like a person shanghaied for an unwanted voyage") (quoting *Janus*, 138 S. Ct. at 2466)). She is incorrect. The portion of *Janus* cited merely describes an argument. The Supreme Court went on to decline to determine whether that description was accurate, merely noting "avoiding free riders is not a compelling interest." *Janus*, 138 S. Ct. at 2466.

Even with *Janus* holding mandatory fair-share fees are unconstitutional, unions were not unjustly enriched by the payment of fair-share fees because, as the name implies, the fees covered the costs of union representation for non-union members. The Seventh Circuit has explained:

> [T]he union negotiated on behalf of these employees as it was required by law to do, adjusted grievances for them as it was required by law to do, and incurred expenses in doing these things . . . . The plaintiffs do not propose to give back the benefits that the union's efforts bestowed on them. These benefits were rendered with a reasonable expectation of compensation founded on the collective bargaining agreement and federal labor law, and the conferral of the benefits on the plaintiffs would therefore give rise under conventional principles of restitution to a valid claim by the union for restitution if the union were forced to turn over the escrow account to the plaintiffs and others similarly situated to them . . . . In claiming restitution the plaintiffs are standing that remedy on its head.

*Gilpin v. AFSCME, AFL-CIO*, 875 F.2d 1310, 1316 (7th Cir. 1989)

The legal landscape has shifted since *Gilpin*, but the underlying principle has not. The unions may not have spent Plaintiff's funds as she would have, but there is no allegation that they failed to provide services as required by Illinois law to her or others similarly situated. Because the fair-share fees were expended on Plaintiff and others similarly situated, she would gain their benefit twice if legal restitution were

allowed. Of course, had the fees not been spent for Plaintiff's benefit—and thus been available through equitable restitution—the calculus might be different.

The Court concludes the good-faith defense may be maintained in actions at law, and this action sounds in law rather than equity. Therefore, the good-faith defense is available here. The Court does not reach the question of whether it may be used in suits at equity.

### 2. No Inquiry into a Common Law Tort Analog is Necessary

The *Wyatt* concurrence and dissent suggest the good-faith defense is available only where "[t]he common-law tort actions most analogous to the action" required "that the wrongdoer acted with malice and without probable cause." 504 U.S. at 172 (Kennedy, J., concurring); *id.* at 176 (Rehnquist, C.J., dissenting); *see also id.* at 164 (stating, in the majority opinion, "[i]n determining whether there was an immunity at common law that Congress intended to incorporate . . . we look to the most closely analogous torts."). Relying on these statements, Plaintiff advances the argument that the good-faith defense can only be maintained where the most analogous common law tort required scienter and, further, the most analogous tort here is conversion, which lacked a scienter requirement at common law. (Doc. 14 at 11-12).

Plaintiff also asserts the majority opinion in *Wyatt* is binding precedent which "precludes a 'good faith' defense when the most analogous common-law tort imposed strict liability." (Doc. 14 at 13). Supreme Court decisions interpreting federal law are, of course, binding on this and every court, but not everything stated in a Supreme Court opinion constitutes binding precedent. "When an opinion issues for the Court,"

courts are bound by the result and "those portions of the opinion necessary to that result." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996).

Dicta are "the part[s] of an opinion that a later court, even if it is an inferior court, is free to reject." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988). There are sound foundations underlying the distinction between dicta and holdings. Dicta "not being integral elements of the analysis underlying the decision—not being grounded in a concrete legal dispute and anchored by the particular facts of that dispute—[ ] may not express the judges' most careful, focused thinking." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). Additionally, allowing dicta binding force would undermine the separation of powers; "to give the inessential parts of an opinion the force of law would give judges too much power, and of an essentially legislative character." *Id.*

It can be difficult to tell where a holding ends and dictum begins in some situations. But not so with the *Wyatt* Court's musings on the good-faith defense. The Supreme Court was clear that "the precise issue" decided in *Wyatt* was "whether qualified immunity . . . is available for private defendants faced with § 1983 liability" under *Lugar*. 504 U.S. at 168–69. The Supreme Court answered in the negative but refused to "foreclose the possibility that private defendants . . . could be entitled to an affirmative defense based on good faith." *Id.* at 169; *see also Richardson*, 521 U.S. at 413 ("*Wyatt* explicitly stated that it did not decide whether or not the private defendants before it might assert, not immunity, but a special 'good-faith' defense.").

Therefore, all that *Wyatt* says about the good-faith defense is dicta. Persuasive dicta, but dicta nonetheless.

Plaintiff's statement that *Wyatt* is binding precedent in this context brings her perilously close to misrepresenting the state of the law. Particularly concerning is that Attorney Jonathan F. Mitchell, representing Plaintiff, knew or should have known this when he submitted and signed Plaintiff's response. The response cites *Carey* (Doc. 14 at 23)—a case in which Attorney Mitchell was also counsel and advanced the same argument. *Carey* states in no uncertain terms that the portion of *Wyatt* discussed is nonbinding dicta. 2019 WL 1115259, at *6 ("The Court's holding in *Wyatt* was far narrower . . . than Plaintiffs present it.").

*Carey* also correctly explained the dicta in *Wyatt* was "far murkier" than Plaintiff suggests. *See id.* Whether a common law analog is necessary is therefore susceptible to dispute and has, in fact, been disputed. *See Danielson*, 340 F. Supp. 3d at 1086 (noting the Ninth Circuit did not require an analysis of analogous common law torts in *Clement* but suggesting the Second Circuit in *Pinsky* did); *Cook*, 2019 WL 982384, at *6. Additionally, no court has yet barred the good-faith defense on common law analog grounds. *Carey*, 2019 WL 1115259, at *6 (noting all courts to have required a common law analog tort determined the one in question had a scienter requirement).

Several courts recently considering the question have provided compelling reasons why the good-faith defense should not involve looking to the most analogous common law tort. The Northern District of Illinois held "limiting principles of scienter

or motive are not consistent with the Supreme Court's approach [in *Wyatt*] because they would still leave private parties exposed to a damages verdict for relying on seemingly valid state laws that were later held to be unconstitutional." *Winner*, 2016 WL 7374258, at *6. The District of Oregon noted "affirmative defenses need not relate to or rebut specific elements of an underlying claim," so to require the good-faith affirmative defense to effectively rebut a scienter element of a common law tort would be in tension with its status as an affirmative defense. *Cook*, 2019 WL 982384, at *6 (citing *Jarvis v. Cuomo*, 660 F. App'x 72, 75–76 (2d Cir. 2016)).

This Court agrees with the Northern District of Illinois and District of Oregon. The principles of fairness and equality underlying the good-faith defense in the § 1983 context demand a private defendant relying in good faith on a presumptively constitutional statute not be abandoned and exposed when the law is subsequently held unconstitutional, while the State remains cloaked in sovereign immunity and its officials are shielded by the veil of qualified immunity. Quibbles over which tort as it existed at common law in 1871 is most analogous to the harm wrought by the statute in question would only undercut these purposes.[5]

---

[5] If, however, this Court were to reach the issue, it would determine that either tortious interference with a contract (or business expectancy) or abuse of process was more analogous to the instant claim than conversion; and both of those torts require scienter. *See Carey*, 2019 WL 1115259, at *7. The reason these torts are the proper analogs is that "[c]onversion involves taking another's property, regardless of intent, whereas the gravamen of the First Amendment claim in this case is that the Union Defendant[s] expended compelled agency fees on political and ideological activities that Plaintiffs oppose." *Danielson*, 340 F. Supp. 3d at 1086; *see also Carey*, 2019 WL 1115259, at *7; *Cook*, 2019 WL 982384, at *6; *Crockett*, 2019 WL 1212082, at *5.

### 3. Seventh Circuit Precedent Does Not Require the Court to Deny the Good-Faith Defense Here

In *Riffey v. Rauner*, 910 F.3d 314, 315 (7th Cir. 2018) (*Riffey II*), *petition for cert. filed*, No. 18-1120, the Seventh Circuit described its prior opinion in that matter as agreeing "with the putative class that no one could be compelled to pay fair-share fees . . . and that any such objector would be entitled to have his or her payments refunded." Plaintiff seizes upon this line, proffering: "*Riffey* did not consider or discuss the good-faith issue, but its statement regarding the propriety of refunds is a binding pronouncement on this [C]ourt." (Doc. 14 at 22).

This Court has already explained the difference between binding precedent and dicta in detail. *Supra* Section I(C)(2). The phrase Plaintiff cites is dicta. The question addressed by the earlier opinion was whether a class could be certified. *Riffey v. Rauner*, 873 F.3d 558, 560 (7th Cir. 2017), *vacated*, 138 S. Ct. 2708, 2708–09 (2018) (*Riffey I*). The appellant filed a petition for a writ of certiorari, which the Supreme Court granted, vacating and remanding "for further consideration in light of *Janus*." 138 S. Ct. at 2708. On remand, the Seventh Circuit held "the district court acted well within its authority when it declined to certify a class action," determining the Supreme Court's intervening decision in *Janus* did not alter its calculation. *Riffey II*, 910 F.3d at 319. The Seventh Circuit specifically stated, however, that individuals "who wish to pursue refunds are free to seek to do so; we make no comment on such cases or the defenses the Union may endeavor to raise in them." *Id.*

As previously explained, not every phrase jotted by the Seventh Circuit or the Supreme Court binds this Court. Although this Court is readily persuaded by dicta

from those courts, this single statement taken out of context does not mean the Seventh Circuit intended to suggest no affirmative defenses were available. The Seventh Circuit's express disavowal of deciding such issues in *Riffey II* makes clear the Court is right to be unpersuaded.

### 4. The Good-Faith Defense is Available to Private Institutional Defendants

Plaintiff next argues the good-faith defense cannot shield institutions, but only individuals, just as qualified immunity protects officers but not counties and municipal corporations. (Doc. 14 at 18-19). Defendants respond the defense has been applied to institutions and the rationale behind the good-faith defense supports that application. (Doc. 18 at 8).

It is certainly true that some of the circuits to have considered the good-faith defense have allowed it for institutional defendants. *Jordan*, 20 F.3d at 1277 (holding a law firm might be entitled to assert a good-faith defense); *Vector Research*, 76 F.3d at 699 (appearing to hold the same); *Clement*, 518 F.3d at 1097 ("The facts of this case justify allowing Monterey Tow Service," a private corporation, "to assert such a good faith defense."). While institutions were before the courts in those cases, however, it does not appear the argument made by Plaintiff here was presented to them; those opinions are therefore of limited persuasive value in answering the instant question.

Nothing in the good-faith defense suggests it ought to be understood as perfectly congruent with qualified immunity. As the Supreme Court explained in *Wyatt*, "the reasons for recognizing [qualified] immunity were based not simply on the existence of a good faith defense at common law, but on the special policy concerns

involved in suing government officials." 504 U.S. at 167; *see also id.* at 170–71 (Kennedy, J. concurring) ("In the context of qualified immunity" the Supreme Court has "diverged to a substantial degree from the historical standards . . . . This transformation was justified by the special policy concerns arising from public officials' exposure to repeated suits.").

But these special policy concerns also made qualified immunity improper for municipal corporations. Qualified immunity rests on "two mutually dependent rationales":  (1) allowing liability for officers who must exercise discretion and who do so in good faith would be unjust and (2) the threat of liability might deter officers from executing their duties "with the decisiveness and the judgment required by the public good." *Owen v. City of Independence*, 445 U.S. 622, 654 (1980) (internal quotation marks omitted) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974) *abrogated in part on other grounds by Harlow*, 457 U.S. 800). But no injustice necessarily arises from requiring a policymaker to bear the costs of an unconstitutional policy. *Owen*, 445 U.S. at 655. And while society has an interest in executive officials executing the laws without paralysis resulting from potential liability for split-second calls on complicated constitutional questions, legislative or quasi-legislative decisions ought to be made with an eye toward the Constitution.[6] *Id.* at 656. This accords with restrictions on municipal liability, which "is limited to action for which the municipality is actually responsible," action taken "pursuant to

---

[6] This is not to imply that executive officials can simply ignore the constitutionality of their actions. Their immunity is qualified rather than absolute for good reason. *See Scheuer*, 416 U.S. at 247–48.

a municipality's 'official policy.' " *Pembauer v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

These concerns do not inhere in private institutional defendants. Defendants did not make a policy which ultimately was held unconstitutional; the State of Illinois did. Defendants are not governmental actors who should consider at every step the potential they might be violating constitutional rights; they are private actors entitled to rely on the State's laws. So, the reasons against extending qualified immunity to municipal corporations and counties are inapposite.

Plaintiff notes this standard creates the anomaly that public institutions are treated differently from public officials, but private institutions are not treated differently from their agents. But she misunderstands the nature of the anomaly. The oddity is not that private institutions are treated the same as private individuals, but rather that public institutions are not treated the same as public officials. This oddity is justified because of the particular policy concerns essential to the public, legislative character of public institutions. Those concerns being absent here, the Court rejects Plaintiff's argument that private institutional defendants may not avail themselves of the good-faith defense.

D. *The Requirements of the Good-Faith Defense*

The good-faith defense exists and is available to Defendants in this case to argue against Plaintiff's specific claim. What remains is to determine whether Defendants have shown they acted in good faith. Plaintiff argues Defendants cannot establish a good-faith defense to her *Janus* claim without (1) affirmatively showing they complied with *Abood* and (2) presenting evidence of Defendants' officers'

subjective beliefs, both of which she argues require factual development and therefore cannot be decided at this time. (Doc. 14 at 20-21). The Court disagrees.

### 1. Defendants Need Not Show Perfect Compliance with *Abood* to Avail Themselves of the Good-Faith Defense Against a *Janus* Claim

Plaintiff asserts "the union cannot establish 'good faith' unless it shows that it fully complied with the pre-*Janus* constitutional strictures on agency shops." (Doc. 14 at 20). But as the District of Alaska explained, the "argument that discovery is needed on a different claim for different relief on a different class before the court can apply the good faith defense simply does not track." *Crockett*, 2019 WL 1212082, at *6; *see also Carey*, 2019 WL 1115259, at *6.

*Janus* held the First Amendment is violated when "an agency fee []or any other payment to the union" is "deducted from a nonmember's wages." 138 S. Ct. at 2486. Under *Abood*, this was not true. 431 U.S. at 223. The good-faith defense requires only the alleged unlawful conduct—here the taking of fair-share fees—be done in good faith. It does not require complete good faith in all actions. If Defendants improperly spent the fair-share fees, Plaintiff would have an independent *Abood* claim but it would not render the exaction of the fee an act in bad faith. Plaintiff cannot embed an *Abood* claim in a *Janus* claim and thereby shift the burdens of pleading, proof, and persuasion.

### 2. Defendants Have Shown the Good-Faith Defense Bars Plaintiff's *Janus* Claim

Although there may be some disagreement as to what showing is needed to establish good faith, *see Carey*, 2019 WL 1115259, at *5 ("Circuit Courts disagree

about precisely what standard should apply in the good faith analysis"), the primary differentiation appears to be whether the analysis is solely subjective or also includes an objective component, *id. See also Lewis*, 782 F. Supp. 2d at 715. Determining a precise standard is unnecessary here because Defendants' reliance on *Abood* was not only objectively reasonable but shows subjective good faith as a matter of law. *See Danielson*, 340 F. Supp. 3d at 1086–87. "[R]egardless of personal opinions, individuals are entitled to rely upon binding United States Supreme Court precedent." *Lee*, 2019 WL 1323622, at *2. Thus, where there is a valid state statute constitutional under then-current Supreme Court precedent, subjective good faith may be presumed.

Indeed, to do otherwise results in an odd situation: if Defendants' officers "subjectively believed the Supreme Court would *not* overrule *Abood*, [Defendants'] collection of agency fees, up until *Janus*, would be shielded by the good faith defense, but not so if the same [officers] instead subjectively believed (correctly) that the Supreme Court *would* overrule *Abood*." *Danielson*, 340 F. Supp. 3d at 1086 (emphasis in original). But "reading the tea leaves of Supreme Court dicta has never been a precondition to good faith reliance on governing law." *Cook*, 2019 WL 982384, at *7; *see also Winner*, 2016 WL 7374258, at*5 ("Any subjective belief [Defendants] could have had that the precedent was wrongly decided and should be overturned would have amounted to telepathy."). To require such divinations would "imperil the rule of law." *Cook*, 2019 WL 982384, at *7. "Inviting discovery on the subjective anticipation of an unpredictable shift in the law undermines the importance of observing existing

precedent and ignores the possibility that prevailing jurisprudential winds may shift. This is not a practical, sustainable or desirable model." *Danielson*, 340 F. Supp. 3d at 1086.

Presuming subjective good faith, by contrast, follows from bedrock principles. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The highest court in the land held a law identical in all relevant respects to the Illinois statutory scheme did not offend the First Amendment. *Abood*, 431 U.S. 209. That "*Abood* was wrongly decided," *Janus*, 136 S. Ct. at 2486, was a decision only that Court could make. Until it did so, reliance on *Abood* was nothing less than justified reliance on the law of the land. The Court agrees with the other courts to have considered this question and holds Defendants' good faith is established as a matter of law. *Danielson*, 340 F. Supp. 3d at 1086; *Cook*, 2019 WL 982384, at *7; *Carey*, 2019 WL 1115259, at *5–6; *Crockett*, 2019 WL 1212082, at *6; *Janus*, 2019 WL 1239780, at *3; *Hough*, 2019 WL 1274528, at *1; *Lee*, 2019 WL 1323622, at *2; *see also Winner*, 2016 WL 7374258, at *5. Plaintiff's argument that discovery into Defendants' officers' state of mind is necessary (Doc. 14 at 21) is therefore rejected.

In *Wyatt*, the dissent charged there was no reason "other than a needlessly fastidious adherence to nomenclature" to deny private § 1983 defendants qualified immunity while allowing the existence of a good-faith defense. 504 U.S. at 177. Justice Kennedy responded in his concurrence: "By casting the rule as an immunity, we imply the underlying conduct was unlawful, a most debatable proposition in a case

where a private citizen may have acted in good-faith reliance upon a statute." *Id.* at 173. This case demonstrates the importance of the concurrence's observation. Plaintiff does not allege Defendants meant to behave unlawfully. Rather, they acted in the utmost good faith reliance upon a state statutory scheme so similar to one upheld by the Supreme Court that Court could not find it unconstitutional without overruling its prior decision. To suggest Defendants' conduct was "unlawful" or even wrong while it was in accordance with state law and Supreme Court precedent would undermine basic principles of equity and fairness. The good-faith defense prevents that injustice here.

## II. Availability of Retrospective Monetary Relief for Conduct Previously Authorized by the Supreme Court

The Court also agrees with the Northern District of California's observation "there is a strong argument that when the highest judicial authority has previously deemed conduct constitutional, reversal of course by that judicial authority should never, as a categorical matter, result in retrospective monetary relief based on that conduct." *Hough*, 2019 WL 1274528, at *1. That court suggested "in situations where the Supreme Court has reversed a prior ruling but not specified that the party before it is entitled to retrospective monetary relief, it seems unlikely that lower courts should even consider awarding retrospective monetary relief based on conduct the Court had previously authorized." *Id.*

This line of reasoning is deeply persuasive to this Court. It is buoyed, moreover, by the Supreme Court's statement in *Janus* that although "the loss of payments from nonmembers may cause unions to experience unpleasant transition costs in the short

term" those "disadvantages" had to be weighed "against the considerable windfall that unions have received under *Abood* for the past 41 years." 138 S. Ct. at 2485–86. Although certainly not dispositive, the Supreme Court does not appear to contemplate the "windfall" being disgorged, nor the potential that some unions might face an existential threat from lawsuits such as the present one. Prudence, equity, and fairness would have counseled the same result even absent the good-faith defense.

## III.    Plaintiff's Possible *Abood* Claim

In the Complaint, Plaintiff separately requests a refund of "any and all 'fair-share fees' " and "any and all 'fair-share service fees' that were spent on political and ideological expenditures, in violation of *Abood* and pre-*Janus* cases." (Doc. 1 at 5-6). Defendants have moved to dismiss this as a separate claim (Doc. 12 at 26-27). Plaintiff does not directly address this portion of Defendants' motion but does include the now-rejected argument that Defendants must prove compliance with *Abood* to establish the good-faith defense against Plaintiff's *Janus* claim. (Doc. 14 at 20). The Court is uncertain if Plaintiff intended this request to be a separate claim or rather a more limited request in case the Court determined there was a good-faith defense which applied to fair-share fees except where Defendants failed to show they had complied with *Abood*.

Either way, the request does not survive. Plaintiff has not alleged any facts indicating an *Abood* violation. If it was intended as an independent claim, the claim lacks "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. The claim

therefore would be dismissed under Rule 12(b)(6). If the request is merely a separate request for damages that anticipates a potential application of the good-faith defense, the attempt to acquire any damages fails because the Court held above that the good-faith defense bars Plaintiff's *Janus* claim *in toto*.

## IV.  **State-Law Claims**

Invoking supplemental jurisdiction, Plaintiff asserts claims for "conversion, trespass to chattels, replevin, unjust enrichment, restitution, and any other legal or equitable cause of action that offers relief" to her. (Doc. 1 at 5). Defendants seek dismissal of these claims, arguing they are preempted by an Illinois statutory scheme and that Plaintiff has failed to state the elements of the various asserted claims because the fair-share fees were authorized. (Doc. 12 at 24-25). Defendants further argue the state law claims have been abandoned by Plaintiff's failure to defend them in her response. (Doc. 18 at 2 n.1).

The Court declines the invitation to reach these claims. "The supplemental-jurisdiction statute provides that the district court 'may decline to exercise supplemental jurisdiction' over state-law claims if the court 'has dismissed all claims over which it has original jurisdiction.'" *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (quoting 28 U.S.C. § 1367(c)(3)). "Indeed, when the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler ex rel. Dietchweiler v. Lucas*, 827 F.3d 622, 630–31 (7th Cir. 2016). There are three circumstances which may rebut the presumption:

(1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009) (internal quotation marks and citation omitted).

No claims remain over which this Court has original jurisdiction. There is no statute of limitations issue which the Court is aware of, and the Court has not expended substantial resources such that a duplication of effort would occur in state court. And while Defendants have made strong arguments in favor of the dismissal of the pendent claims, the Court does not believe it is "absolutely clear" that all of the various state theories of liability alleged are preempted or require a wrongful or unauthorized taking.[7] In accordance with the presumption, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## CONCLUSION

Defendants' Motion to Dismiss (Doc. 11) is GRANTED in part as a motion under Rule 12(b)(6) and in part construed as a motion for judgment on the pleadings under Rule 12(c). Plaintiff's *Janus* claim is DISMISSED WITH PREJUDICE. To the extent Plaintiff sought to plead a claim under *Abood*, it is DISMISSED WITHOUT PREJUDICE. Plaintiff may replead the *Abood* claim within twenty-one (21) days of

---

[7] The Court is skeptical that abandonment applies to the failure to respond to an argument in a motion to dismiss where the movant bears the burden, given that the caselaw cited by Defendants discusses failure to respond to motions for summary judgment and failure to raise arguments in appellant's briefs on appeal. (Doc. 18 at 2 n.1 (citing *Palmer v. Marion Cty.*, 327 F.3d 588, 597–98 (7th Cir. 2003)). But there is no need to address the issue here.

the date of this Order. However, to ensure expedient handling of this matter, Plaintiff MUST submit a notice within seven (7) days of the date of this Order indicating whether she intends to replead the *Abood* claim; if not, the matter will be terminated and judgment entered. Plaintiff's various and sundry state law claims are DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

Entered this 11th day of April 2019.

_____s/ Joe B. McDade_____
JOE BILLY McDADE
United States Senior District Judge
